UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>1:21-cv-24263-XXXX</u>
**JURY TRIAL DEMANDED**

SEAN MALONE,

     *Plaintiff*,

v.

MR. GLASS DOORS & WINDOWS
MANUFACTURING, LLC *INDIVIDUALLY
AND D/B/A* MR. GLASS DOORS & WINDOWS,
and ULISES SENARIS (individually),

     *Defendants*.

_____/

## COMPLAINT

Plaintiff Sean Malone, by his undersigned counsel, Derek Smith Law Group, PLLC, hereby

complains of Defendant Mr. Glass Doors & Windows Manufacturing, LLC *individually and d/b/a*

Mr. Glass Doors & Windows, (the "**Company**" or "**MR-GLASS**"), and Defendant Ulises Senaris

("**Senaris**"), collectively, ("**Defendants**"), and alleges as follows:

## INTRODUCTION

1.     This case is about an indigent, blue-collar worker whose employer trapped him in

a workplace infested with astonishing and abusive discrimination and retaliation.

2.     Plaintiff Sean Malone seeks damages against the Company pursuant to Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("**Title VII**"), 42 U.S.C. §

1981 **("§ 1981"**), 42 U.S.C. § 12102(a), et seq. ("**ADA**"), the Florida Civil Rights Act of 1992,

§760.01, *et seq.*, Florida Statutes ("**FCRA**"), and Florida Statutes, § 440.205, ("**Workers'**

**Compensation**").   Plaintiff seeks damages against Senaris, individually, for violations arising under § 1981.

3.      The Company made clear that Malone was not welcome in its workplace from the outset of his employment.  His co-workers would say things like, "We don't want you here," or "get away from here," or "this place is for Cuban's only."

4.      The Company's agents began referring to Malone as a "nigger" on his very first day.  Throughout his employment the Company's agents would say things like, "Good morning, nigger," or randomly say, "Fuck you, nigger," or, "You're a stupid dumb, nigger," while Malone completed his daily tasks.   To be sure, no one ever called Malone by his name—instead, he was the "black guy," or the "lazy American," or, most often, the "nigger."

5.      The Company deliberately failed to correct or even investigate Malone's repeated discrimination complaints.  For example, Plaintiff approached his immediate supervisor and said, "Man, they're calling me 'nigger' every day, and that's not cool."  Malone complained to the warehouse manager, who in turn claimed he did not understand English.  Then, when Plaintiff complained via an interpreter, the manager still said he could not understand what Plaintiff was saying (that his co-workers were calling him a "nigger" and he could not take it anymore).  Other managers claimed they would "handle it," however, nothing ever changed.  Even Senaris, the Company's President, told Malone, "I don't believe you," after Plaintiff complained and then showed Senaris racist hate speech in the Company's bathroom.  The Company never took any corrective action.

6.      The Company intentionally discriminated against Plaintiff by treating him less favorably than similarly situated Hispanic and/or Cuban employees.  The Company hired Malone to operate forklifts yet rarely allowed him to operate the forklifts even though he was licensed to

2

do so.  Meanwhile, the Company allowed non-certified Hispanic and/or Cuban employees to operate the forklifts.

7.      The Company hired Malone at $13 an hour, and claimed it would pay him $15 after a 90-day probationary period.  After the 90-day probationary period, however, the Company did not pay Malone $15 an hour.  Conversely, the Company paid two Hispanic and/or Cuban employees who started the same time as Plaintiff a $15 wage after the 90 days.

8.      Likewise, the Company disciplined Malone more severely than similarly situated Hispanic and/or Cuban employees.  For instance, when Malone had an accident and broke $300 worth of glass, a Company executive pointed at Plaintiff and said, "Send that black guy home for three days—no pay!"  Yet, when a Hispanic and/or Cuban employee dropped an entire pallet upwards of $15,000, or even $100,000, the Company took no disciplinary action.

9.      At bottom, Defendants are liable for depriving Plaintiff of his personal dignity and his civil right to pursue an equal employment opportunity in a work environment free from unrelenting discrimination, harassment, and retaliation.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action under 28 U.S.C. § § 1331 (federal questions) and 1343(a)(3) (civil rights), 42 U.S.C. § 2000e-5(f)(3) (Title VII), and §1367 (supplemental jurisdiction).

11.     Venue is proper in the Southern District of Florida under 42 U.S.C. § 20003-5(f)(3) and 28 U.S.C. § 1391(b) because Defendants reside within the Southern District of Florida, and because a substantial portion of the acts or omissions giving rise to this action occurred in the Southern District of Florida.

## PARTIES

12.    Plaintiff Sean Malone is an individual residing in Miami-Dade County, Florida.

13.    Plaintiff is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

14.    Defendant Mr. Glass Doors & Windows Manufacturing, LLC is a Florida Limited Liability Company with a principal address at 8051 NW 79th Pl, Medley, Florida 33166.

15.    MR-GLASS is a well-known in South Florida as a preeminent doors and windows supplier for both commercial and residential purposes.

16.    Defendant Mr. Glass Doors & Windows Manufacturing, LLC is a "person" within 42 U.S.C. §2000e(a), and an "employer" within the meaning of 42 U.S.C. §2000e(b).

17.    Upon information and belief, MR-GLASS employs, at the very least, more than 50 employees.

18.    Defendant Ulises Senaris is an individual, believed to be residing in Miami-Dade County, Florida.

19.    Defendant Senaris is the President, Owner and founder of MR-GLASS.

20.    Defendant Senaris is subject to individual liability pursuant to § 1981.

## ADMINISTRATIVE PREREQUISITES

21.    Plaintiff has complied with all administrative requirements.

22.    On or about March 29, 2021, Plaintiff timely dual-filed a charge of discrimination (Charge No. 510-2021-03310) with the U.S. Equal Employment Opportunity Commission ("**EEOC**"), and the Florida Commission on Human Relations ("**FCHR**"), naming Mr-Glass Doors & Windows Manufacturing, LLC as the Respondent, and checking boxes for race, color, national origin discrimination, and disability discrimination, and retaliation.  On or about October 26, 2021,

Plaintiff dual-filed an amended charge of discrimination naming the same respondent, and checking the boxes above, and adding claims under the "other" category, including "hostile work environment" and "retaliatory hostile work environment."

23.     On or about December 2, 2021 the EEOC issued a right to sue notice.

24.     On or about December 6, 2021, Plaintiff timely commenced this action.

## FACTUAL ALLEGATIONS

25.     Plaintiff Sean Malone is a 40-year-old black, African American U.S. Citizen.

26.     Malone began working for the Company at a point in his life where he was determined to find a fresh start.  Indeed, Malone moved to Miami after several years incarcerated in Baltimore on a drug charge.

27.     Upon his arrival to Miami, Malone was homeless.  Determined to make things work, however, Malone completed a rehabilitation program with the Salvation Army, obtained his forklift certification, and applied for work through a placement agency in Overtown.

28.     However, Malone's dreams of a fresh start became a nightmare when Defendants hired him, and began subjecting him to relentless discrimination because of his race, color, and national origin.

### The Company Pays Plaintiff Less than Similarly Situated Hispanic and/or Cuban Employees because of His Race, Color, and National Origin

29.     On or about October 27, 2020, the Company hired Malone as a "Forklift Operator" in the "Glass Department" of its warehouse located in Medley, Florida.  Plaintiff's job responsibilities included picking glass in the warehouse to fulfill orders.

30.     The Company hired Malone at $13 an hour and promised he would begin earning $15 an hour, after a 90-day probationary period.

31.     After the 90-day probationary period, however, the Company continued paying Malone $13 an hour.  Yet, the Company paid two Hispanic and/or Cuban employees who started at the same time as Plaintiff $15 an hour after the 90 days.

32.     Indeed, Malone approached Mr. Luis after the two Hispanic employees told Malone that the Company was paying them $15 an hour.  Malone also complained to H.R.  Still, the Company insisted on paying Malone $13 an hour.

33.     Further, while the Company hired Malone as a "forklift operator," the Company did not allow Malone to operate the forklifts even though he was licensed to do so.  Conversely, the Company allowed Hispanic and/or Cuban employees to operate the forklifts even though they were non-certified.

### The Company Subjects Plaintiff to an Unrelenting Hostile Work Environment

34.     The Company subjected Malone to a Hostile Work Environment based on his race, color and national origin.

35.     On or about November 2, 2020, the Company and its agent began subjecting Malone to a work environment infested with vile, racist discrimination.  Malone's co-workers Brian (last name unknown), Kevin (last name unknown), and Eddie, (last name unknown) verbally abused Malone because of his race, color, and his U.S. national origin.[1]

36.     For instance, on a daily and repeated basis, Malone's coworkers would greet him with, "Good morning, nigger," or randomly say, "fuck you, nigger," or "you're a stupid dumb nigger," while Malone was picking glass in the warehouse.  Plaintiff's co-workers would make fun of his missing teeth.  They would huddle around and say things like, "I bet you can suck a

---

[1] The reason Malone is unaware of many of Company-agent's last names is because no one even gave him the time of day to introduce themselves.  Indeed, when Malone approached, the Warehouse Manager, he was met with hostility, and dejected as the "black guy," or the "lazy American."

good dick," or "How'd you lose your teeth, sucking a black girl's pussy?" The three would then run off, laughing, leaving Malone feeling the lowest he had ever felt.

37. Malone's co-workers made it clear he was not welcome in their workplace because he was a black U.S. Citizen. For example, Brian, Kevin and Eddie would say things like "Cubans hate Americans because they're lazy," or, "This is for Cubans only … You don't *belong* here." Other times Brian, Kevin and Eddie—among other unknown employees Hispanic and/or Cuban employees—insisted on calling Malone the "black guy," the "lazy American," or a "stupid, dumb nigger."

38. During the 2020 election season, Malone's co-workers would stop him and say, "Trump, nigger!" or "I'm just like Trump—I don't like blacks!"   After the attack of the Capitol in early January of 2021, Malone was leaving for the day when a Hispanic employee said, "What you think of Trump, nigger?"

39. The Company's workplace was infested with imagery of slavery, lynching, and the Jim Crow era. Indeed, as Malone walked the warehouse aisles, he would discover drawings of black stickmen, lynched in hangman games.



40. The Company's agents drew these images on supply boxes to target Plaintiff because of his race and color.

41.     Malone showed Mr. Luis these racist images, yet no investigation occurred, resulting in *more* not less racial abuse, hostility, and humiliation.

42.     This point is buttressed by Malone's experience on Thanksgiving Day of 2020. Malone was taking a bathroom break when he discovered yet another a vile display of racial discrimination.  Malone went to the bathroom and saw "Fuck you pussy ass niggas" displayed on the wall.  Plaintiff's heart sunk.   Here he was on Thanksgiving, and he could not even get through the day without being subjected to racism.



43.     Malone left the bathroom dejected and angry.  However, he noticed Senaris walking by as he exited, and saw this as the opportunity to once and for all let the Company's President know of the incredible and relentless racism.   Surely, the founder of MR-GLASS should do something to rectify this incredible racism.

44.     However, just like the other supervisors and managers, Senaris did not care.  He said, "I don't believe you."  In turn, Malone opened the bathroom door and showed Mr. Senaris the racist message.  Senaris immediately took a picture on his phone, shut the bathroom down, and had the vile message painted over.

45.     Senaris had the message painted over not in response to Malone's objection and extreme offence taken to it, but rather to insulate Senaris' Company.  To be sure, Defendants never took *any* action to even investigate these discrete racist acts.

**The Company Deliberately Disregards Plaintiff's Discrimination Complaints**

46.     The Company deliberately disregarded Malone's campaign to end workplace racism based on his race, color, and national origin.

47.     On multiple occasions—upwards of ten times per week—Malone would complain to different supervisors regarding a workplace permeated with racial discrimination.  Throughout the Fall and Winter of 2020, Malone complained to Mr. Luis, the Company's "Glass Department Manager," The Company's President, Mr. Senaris, The Company's Warehouse manager and The Company's "Door Department Manager."

48.     Malone's only hope was to approach his immediate supervisor, Mr. Luis.  For instance, Plaintiff would approach Mr. Luis and say, "Man, they're calling me 'nigger' every day, and that's not cool."  Mr. Luis did nothing to investigate nor even ask Plaintiff any further questions.  So, Malone gave another example: "I find these hangmen with blacks on nooses being lynched."  Still, Mr. Luis did nothing.

49.     On other occasions, Malone attempted to approach the supervisors he was designated to "report to," however, the Company took no action.  For example, supervisors would say things like, "OK, I'll handle it," yet the rampant racism that permeated the Company's workplace never "got handled."  Similarly, supervisors would pretend they could not understand English.  The warehouse manager, for instance, pretended he could not understand English in the face of Malone's repeated please. The warehouse manager even claimed he could not understand

Plaintiff's complaints—that "I'm being called a nigger every day"—even after Plaintiff complained to the manager via a Spanish-speaking interpreter.

50.     Malone could not understand why the Company did not want to redress this situation.  The Company's supervisors would brush Malone off, and do nothing even though he was begging them, explaining in detail, how he would be called a "nigger" on a repeated and ongoing basis.

51.     The stress, anxiety, anger and fear of going to work every day was taking a serious toll on his well-being.  To be sure, as a result of the incessant race, color and national origin discrimination, the Company forced Malone into an existential crisis.

52.     In or around December of 2020, Malone contemplated killing himself.  He had never dealt with anything like this before.  Here he was, a guy who worked hard to escape the lows of addiction, got his forklift certification renewed, only to be subjected to the most hostile, racist work environment he had ever been exposed to.  Malone realized, the Company's supervisors, managers, officers, and even its President *did not care* that its employees—and even themselves—had relentlessly discriminated against Plaintiff, day in and day out.

### The Company's Officers and Executives Relentlessly Discriminate Against Plaintiff because of his Race/Color/National Origin

53.     In or around late January of 2021, Malone was pushing his cart, maneuvering around the warehouse when he accidentally broke a few pieces of glass valued at about $300.  When he turned the corner, one of the wheels on his cart hit something on the floor and three small pieces of glass fell on the floor.

54.     Shortly after Malone's accident—once word got out that it was Plaintiff who had the accident—the Company's officers and managers rushed down to the warehouse floor.

55.     A moment later, an unknown Company officer—who worked in the Company's executive suite—looked at the glass, then to Malone, pointed his finger, and said, "Send that black guy home for three days—no pay!"

56.     Plaintiff's heart sunk deeper than it had throughout the course of his employment. Not only were his co-workers calling him things like "stupid dumb nigger," but the Company's own officers and managers were doing the same thing.

57.     The Company disciplined Malone more severely than similarly situated Hispanic and/or Cuban employees.  In fact, when Hispanic and/or Cuban employees accidentally broke glass, the Company took no disciplinary action.

58.     For example, on one occasion, Malone witnessed a Hispanic employee break large sheets of glass valued at upwards of $100,000, and still, the Company took no action.

59.     Another time a Cuban forklift operator, Jose (last name unknown), dropped an entire pallet of glass with about 150 pieces valued at about $15,000.  The Company never disciplined Jose, and he faced zero repercussions.

60.     Conversely, when Malone broke $300 worth of glass, Company executives rushed to the warehouse floor and suspended Malone for three days without pay ("Send that black guy home for three days—no pay!").

61.     Malone approached Mr. Luis and complained that it was not fair that the Company was suspending Malone for three days without pay—because the Company did not suspend Jose for three days without pay.  Mr. Luis said, "Sorry, man, I gotta do it."

62.     Hence, the Company treated Malone less favorably than similarly situated Hispanic and/or Cuban employees because of Plaintiff's race, color, and national origin.

**The Company Coerces Plaintiff After He Initiates Workers' Compensation Claim**

63.     On or about February 9, 2021, Malone suffered and industrial accident and injury.

64.     Plaintiff immediately reported his injury to the Company's "Safety Manager," who in turn immediately escorted Plaintiff to H.R. to report his injury.

65.     The Company called a rideshare service for Plaintiff and sent him to a doctor for an examination, and even required him to undergo a test for narcotics—which was negative.

66.     The doctor provided an accommodation for Malone not to work for several weeks. While the Company paid him for about 10 working days, the Company then refused to pay Plaintiff as required.

67.     Plaintiff then approached Fors in H.R. complaining that he had a right to be paid even though he was out on leave because of his injury.

68.     Plaintiff informed the Company he would retain a worker's compensation attorney.

69.     Shortly thereafter, in or around mid February of 2021, Malone began the process of filing a worker's compensation claim.

70.     While the Company accepted the claim as compensable, the Company delayed authorization for Malone's treatment for weeks.

71.     The Company chose Doctor Susan F. Nelson ("Dr. Nelson") to treat Malone's lower back injury as required by Florida's workers' compensation statute.

72.     On or about February 23, 2021 Dr. Nelson diagnosed Malone with a "Sprain of ligaments of [his] lumbar spine."

73.     Dr. Nelson restricted Malone's functional activity to lifting, loading or pushing no more than 7-10 pounds.  The doctor treated Malone's lower back condition with 750 milligrams

of Methocarbamol and Bio freeze.  Finally, the doctor ordered Malone to attend subsequent physical therapy, scheduled weekly on Tuesdays.

74.     Notwithstanding the doctor's restrictions, however, the Company required Malone to report to work every day.  Worse, the Company required Malone to conduct his regular activities—lifting, pushing, and pulling more than 7-10 pounds—in direct contradiction to Dr. Nelson's restrictions.

75.     When Malone protested, attempting to explain that he was in terrible pain, Fors threatened him, saying, "Either do what you're told, or you won't have a job."

76.     Hence, Fors threatened Malone because of his attempt and/or filing of a workers' compensation claim.

77.     Meanwhile, Malone had three rehabilitation appointments per week and one additional follow up appointment.  Malone attended every single appointment and followed the physician's orders to expediate his recovery.

78.     On or about March 2, 2021, Malone's treating physician increased his physical limitations to no lifting, pushing or pulling of more than 10 pounds, as a result of the Company's instance that Malone continue to life more than 7-10 pounds even though the Company was aware Plaintiff was attending physical therapy and had accommodations for same.

79.     The only reason Malone continued showing up was because Fors threatened his employment if he chose otherwise. Indeed, Fors coerced Malone to come in every single day to turn over his medical documents, even if he was not reporting for duty.

80.     On or about March 19, 2021 the Company wrongfully and unlawfully terminated Malone in retaliation for filing a workers' compensation claim.

81.     Malone protested and said that was not right—he was attending the medical appointments and therapy as he was ordered to do … by the doctors the Company appointed.  Fors said, "That's not my problem."

82.     Shortly after his termination, Plaintiff no longer could afford renting the small room he managed to afford, and in turn once again was homeless.

83.     The above are just some of the examples of unlawful discrimination and retaliation Defendants subjected Plaintiff to on a repeated and ongoing basis.

84.     The Company violated Title VII, § 1981, and the FCRA by unlawfully discriminating against Malone because of his race, color and national origin, and because he opposed and complained about the Company's unlawful employment practices.

85.     The Company violated the FCRA and the ADA/ADAA by failing to accommodate Plaintiff and by forcing him to work, worsening his injuries and increasing his weightlifting restrictions.

86.     The lack of respect shown by Defendants and their conscious disregard for Malone's personal dignity falls well within the broad scope of unlawful employment practices under Title VII, § 1981, the ADA/AAA, and the FCRA.

87.     The Company violated Florida's Workers' Compensation statute by threatening Plaintiff's employment, coercing him, and ultimately terminating him in retaliation for filing a workers' compensation claim.

88.     Plaintiff claims aggravation, activation, and/or exacerbation of any preexisting conditions.

89.     As a result of Defendants' unlawful conduct, Plaintiff has suffered damages, including but not limited to financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with the Company, and continues to suffer the same.

90.     Plaintiff has also suffered emotional distress, mental anguish, loss of personal dignity, and other intangible damages.

91.     Plaintiff also seeks punitive damages against Defendants as both the Company and Senaris violated Plaintiff's rights willfully and/or with reckless indifference to his federal and state civil rights.

## CAUSES OF ACTION

### COUNT I
### Title VII, 42 U.S.C. § 2000e-2(a)
### Disparate Treatment
### (Against Mr. Glass Doors & Windows)

92.     Plaintiff reincorporates the allegations in paragraphs 27-31, 50-59.

93.     The Company intentionally discriminated against Plaintiff by treating him less favorably than similarly situated Hispanic and/or Cuban employees because of Plaintiff's race, color, and national origin.

94.     Plaintiff is a black, African American, United States citizen, and therefore is a member of a protected class.

95.     Plaintiff was qualified for his position because he was a certified forklift operator and because he met the Company's objective qualifications.

96.     The Company treated Plaintiff less favorably than similarly situated Hispanic and/or Cuban employees from the outset of his employment.

97.     The Company did not allow Plaintiff to operate the forklifts even though he was certified to do so.  Conversely, the Company allowed Hispanic and/or Cuban employees to operate forklifts even where those employees did not have a forklift operating license.

98.     The Company told Plaintiff he would be paid $13 an hour for the 90-day period, and then would pay Plaintiff $15 per hour thereafter.  However, the Company never paid Plaintiff more than $13 throughout his employment.  Conversely, after the 90-day period elapsed, the Company began paying two similarly situated, Hispanic and/or Cuban employees the full $15— who started the same time as Plaintiff—yet still paid Plaintiff $13 an hour.  The Company insisted on paying Plaintiff less than similarly situated employees even after Plaintiff complained to Mr. Luis and H.R. regarding the disparity in pay.

99.     The Company disciplined Plaintiff more severely than similarly situated Hispanic and/or Cuban employees. For instance, when Plaintiff had an accident with a piece of glass of about $300, the Company suspended Plaintiff for three days without pay.  ("Send that black guy home for three days—no pay!").    Yet, when non-black employees happened to break glass, the Company took no disciplinary action.  Specifically, the Company took no disciplinary action against Jose (last name unknown)—a Hispanic, Cuban employee—even though he dropped an entire pallet of glass valued at approximately $15,000, yet MR-GLASS took zero disciplinary action.

100.    Jose was similarly situated to Plaintiff in all relevant respects and Jose's accident was far more severe.  To be sure, Jose's accident caused damage to about $15,000 worth of glass, while Plaintiff's accident caused damage to about $300 of glass.  The Company sent Plaintiff home for three days without pay ("Send that black guy home for three days—no pay!"), yet did not take

any disciplinary action against Jose.  Likewise, the Company did not discipline the Hispanic and/or

Cuban employee Plaintiff witnesses break multiple sheets of glass valued at about $100,000.

101.    This point is buttressed by the fact that Mr. Luis recognized that he never suspended

Hispanic and/or Cuban employees for breaking glass.  Indeed, when Plaintiff complained to Mr.

Luis that it was not fair, Mr. Luis said, "Sorry, man, I gotta do it."

102.    On or about March 29, 2021, the Company terminated Plaintiff's employment.

103.    The Company did not terminate any Hispanic and/or Cuban employees.

104.    These allegations give rise to the reasonable inference that the Company

intentionally discriminated against Plaintiff because of his race, color, and national origin.

105.    As an actual and proximate result of the Company's unlawful employment practices

in violation of Title VII, Plaintiff has suffered damages.

106.    The Company's conduct described throughout this complaint was malicious,

willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages

against the Company.

**COUNT II**
**42 U.S.C. § 1981**
**Disparate Treatment**
**(Against all Defendants)**

107.    Plaintiff reincorporates the allegations in paragraphs 27-31, 50-59.

108.    The Company violated § 1981 by intentionally discriminating against Plaintiff by

treating him less favorably than similarly situated Hispanic and/or Cuban employees because of

because of his race, color, and national origin.

109.    Plaintiff is a black, African American, United States citizen, and therefore is a

member of a protected class.

110.    Plaintiff was qualified for his position because he was a certified forklift operator and because he met the Company's objective qualifications.

111.    The Company treated Plaintiff less favorably than similarly situated Hispanic and/or Cuban employees from the outset of his employment.

112.    The Company did not allow Plaintiff to operate the forklifts even though he was certified to do so.  Conversely, the Company allowed Hispanic and/or Cuban employees to operate forklifts even where those employees did not have a forklift operating license.

113.    Further, the Company told Plaintiff he would be paid $13 an hour for the 90-day period, and then would pay Plaintiff $15 per hour thereafter.  However, the Company never paid Plaintiff more than $13 throughout his employment.  Conversely, after the 90-day period elapsed, the Company began paying two similarly situated, Hispanic and/or Cuban employees the full $15—who started the same time as Plaintiff—yet still paid Plaintiff $13 an hour.  The Company insisted on paying Plaintiff less than similarly situated employees even after Plaintiff complained to Mr. Luis and H.R. regarding the disparity in pay.

114.    Further, the Company disciplined Plaintiff more severely than similarly situated Hispanic and/or Cuban employees. For instance, when Plaintiff had an accident with a piece of glass of about $300, the Company suspended Plaintiff for three days without pay.  ("Send that black guy home for three days—no pay!").    Yet, when non-black employees happened to break glass, the Company took no disciplinary action.  Specifically, the Company took no disciplinary action against Jose (last name unknown)—a Hispanic, Cuban employee—even though he dropped an entire pallet of glass valued at approximately $15,000.

115.    Jose was similarly situated to Plaintiff in all relevant respects and Jose's accident was far more severe.  To be sure, Jose's accident caused damage to about $15,000 worth of glass,

18

while Plaintiff's accident caused damage to about $300 of glass.  The Company sent Plaintiff home

for three days without pay ("Send that black guy home for three days—no pay!"), yet did not take

any disciplinary action against Jose.  Likewise, the Company did not discipline the Hispanic and/or

Cuban employee Plaintiff witnesses break multiple sheets of glass valued at about $100,000.

116.   This point is buttressed by the fact that Mr. Luis recognized that he never suspended

Hispanic and/or Cuban employees for breaking glass.  Indeed, when Plaintiff complained to Mr.

Luis that it was not fair, Mr. Luis said, "Sorry, man, I gotta do it."

117.   On or about March 29, 2021, the Company terminated Plaintiff's employment.

118.   The Company did not terminate any Hispanic and/or Cuban employees.

119.   These allegations give rise to the reasonable inference that the Company

intentionally discriminated against Plaintiff because of his race, color, and national origin.

120.   As an actual and proximate result of the Company's unlawful employment practices

in violation of § 1981, Plaintiff has suffered damages.

121.   The Company's conduct described throughout this complaint was malicious,

willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages

against the Company.

## COUNT III
### FCRA § 760.10(1)(a)
### Disparate Treatment
### (Against Mr. Glass Doors & Windows)

122.   Plaintiff reincorporates the allegations in paragraphs 27-31, 50-59.

123.   The Company violated the FCRA by intentionally discriminating against Plaintiff

by treating him less favorably than similarly situated Hispanic and/or Cuban employees because

of his race, color, and national origin.

124.     Plaintiff is a black, African American, United States citizen, and therefore is a member of a protected class.

125.     Plaintiff was qualified for his position because he was a certified forklift operator and because he met the Company's objective qualifications.

126.     The Company treated Plaintiff less favorably than similarly situated Hispanic and/or Cuban employees from the outset of his employment.

127.     The Company did not allow Plaintiff to operate the forklifts even though he was certified to do so.  Conversely, the Company allowed Hispanic and/or Cuban employees to operate forklifts even where those employees did not have a forklift operating license.

128.     Further, the Company told Plaintiff he would be paid $13 an hour for the 90-day period, and then would pay Plaintiff $15 per hour thereafter.  However, the Company never paid Plaintiff more than $13 throughout his employment.  Conversely, after the 90-day period elapsed, the Company began paying two similarly situated, Hispanic and/or Cuban employees the full $15—who started the same time as Plaintiff—yet still paid Plaintiff $13 an hour.  The Company insisted on paying Plaintiff less than similarly situated employees even after Plaintiff complained to Mr. Luis and H.R. regarding the disparity in pay.

129.     Further, the Company disciplined Plaintiff more severely than similarly situated Hispanic and/or Cuban employees. For instance, when Plaintiff had an accident with a piece of glass of about $300, the Company suspended Plaintiff for three days without pay.  ("Send that black guy home for three days—no pay!").    Yet, when non-black employees happened to break glass, the Company took no disciplinary action.  Specifically, the Company took no disciplinary action against Jose (last name unknown)—a Hispanic, Cuban employee—even though he dropped an entire pallet of glass valued at approximately $15,000.

130.    Jose was similarly situated to Plaintiff in all relevant respects and Jose's accident was far more severe.  To be sure, Jose's accident caused damage to about $15,000 worth of glass, while Plaintiff's accident caused damage to about $300 of glass.  The Company sent Plaintiff home for three days without pay ("Send that black guy home for three days—no pay!"), yet did not take any disciplinary action against Jose.  Likewise, the Company did not discipline the Hispanic and/or Cuban employee Plaintiff witnesses break multiple sheets of glass valued at about $100,000.

131.    This point is buttressed by the fact that Mr. Luis recognized that he never suspended Hispanic and/or Cuban employees for breaking glass.  Indeed, when Plaintiff complained to Mr. Luis that it was not fair, Mr. Luis said, "Sorry, man, I gotta do it."

132.    On or about March 29, 2021, the Company terminated Plaintiff's employment.

133.    The Company did not terminate any Hispanic and/or Cuban employees.

134.    These allegations give rise to the reasonable inference that the Company intentionally discriminated against Plaintiff because of his race, color, and national origin.

135.    As an actual and proximate result of the Company's unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

136.    The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

**COUNT IV**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Hostile Work Environment**
**(Against Mr. Glass Doors & Windows)**

137.    Plaintiff reincorporates the allegations in paragraphs 32-49.

138.    Mr. Glass Doors & Windows violated Title VII by subjecting Plaintiff to relentless humiliation, intimidation, and ridicule, because of his race, creating an abusive and/or hostile work environment.

139.    Plaintiff is a black, African American, U.S. Citizen, and therefore is a protected class member.

140.    Plaintiff suffered unwelcome harassment because of his race, color, and national origin, that was both subjectively and objectively hostile.

141.    The abusive nature of Plaintiff's work environment cannot be overstated.  The Company and its agents referred to Plaintiff as a "nigger" every day of his employment.

142.    Plaintiff's coworkers would approach him and say things like, "Good morning, nigger," or, "Fuck you, nigger," or "You're a stupid, dumb nigger."

143.    On other occasions, the Company's employees would approach Plaintiff and say, "We don't want you here," or "You don't belong."

144.    Similarly, employees would approach Plaintiff and call him a "lazy American," or say, "this place is for Cubans only."

145.    During the 2020 election season, Malone's co-workers would stop him and say, "Trump, nigger!" or "I'm just like Trump—I don't like blacks!"  On another occasion, in or around early January of 2021, Plaintiff was leaving work when a Hispanic employee drinking a beer in his truck said, "What do you think of Trump, nigger?"

146.    Further, the Company's employees targeted Plaintiff with racist, hateful imagery. For example, Plaintiff discovered drawings of black stickmen lynched on boxes.  On or about Thanksgiving Day of 2020, Plaintiff discovered a hate message in the bathroom that read: "Fuck you pussy ass niggas."

147.    In or around late January of 2021, a Company executive suspended Plaintiff.   The executive said, "Send that black guy home for three days—no pay!"

148.    Plaintiff perceived the above-described conduct as hostile.

149.    Likewise, any reasonable person would perceive such conduct as hostile.

150.    Indeed, the above-described conduct was frequent and severe and extremely humiliating and was made because of Plaintiff's race, color, and national origin.

151.    Further, this environment was humiliating, and caused Plaintiff extreme emotional distress.  Indeed, in or around December of 2020, Plaintiff contemplated killing himself.

152.    The Company is liable for the above-described conduct because Plaintiff complained about racism upwards of ten times per week to multiple supervisors and department managers.  Moreover, Plaintiff complained directly to the Company president.  Thus, the Company had notice of such conduct.

153.    Still, the Company made clear it had no interest in rectifying these discrete, racist acts.  Indeed, Plaintiff complained to his immediate supervisor, Mr. Luis.  Plaintiff would say, "Man, they're calling me 'nigger' every day, and that's not cool."

154.    On another occasion, Plaintiff told Mr. Luis about the racist pictures throughout the workplace.  Plaintiff showed the photos to Mr. Luis and said, "I find these hangmen with blacks on nooses being lynched."  Still, Mr. Luis nor the Company took zero corrective action.

155.    Plaintiff complained to other supervisors, including the warehouse manager, the doors manager, and the Company President.  One of the supervisors said, "I'll handle it," yet nothing ever got handled.  The warehouse manager told Plaintiff he did not understand English.  But then, when Plaintiff brought an interpreter to complain to the warehouse manager, he still

claimed he did not understand what Plaintiff was saying (that he was being called a "nigger" repeatedly).

156.    Consequently, as a result of the Company's inaction, the abusive and/or hostile work environment intensified.

157.    On Thanksgiving Day of 2020, Plaintiff walked into the bathroom and discovered "Fuck you pussy niggas," written on the bathroom mirror.  Plaintiff complained to Senaris who said, "I don't believe you."  Then Senaris realized Plaintiff was truthful when Senaris himself saw the hate message, took a photo, shut the bathroom down, had it painted over, and failed to initiate an investigation of any kind.

158.    The Company's failure to investigate and/or correct the racial discrimination in its upon actual notice of such conduct necessarily altered the terms and conditions of Plaintiff's employment to the extent the Company maintained a policy that prohibited discrimination.

159.    The Company further altered the terms and conditions of Plaintiff's employment because of his race, color, and national origin, by paying Plaintiff less than Hispanic and/or Cuban employees because of Plaintiff's race, color, and national origin.

160.    The Company altered the terms and conditions of Plaintiff's employment because of his race, color, and national origin, by disciplining Plaintiff more severely than Hispanic and/or Cuban employees,

161.    The Company is liable for the environment because the Company had actual notice of Plaintiff's discrimination complaints, yet took zero corrective action.

162.    The Company's supervisors, managers, officers, and even its President *did not care* that its employees had relentlessly discriminated against Plaintiff, day in and day out, and its supervisors not only took zero corrective action, but actually facilitated the abuse.

163.   The Company violated Title VII, 42 U.S.C. § 2000e-2(a) by subjecting Plaintiff to an abusive hostile work environment because of his race, color, and national origin.

164.   As an actual and proximate result of The Company's unlawful employment practices in violation of Title VII, Plaintiff has suffered damages.

165.   The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

**COUNT V**
**42 U.S.C. § 1981**
**Hostile Work Environment**
**(Against Mr. Glass Doors & Windows)**

166.   Plaintiff reincorporates the allegations in paragraphs 32-49.

167.   The Company discriminated against Plaintiff in violation of § 1981 by subjecting Plaintiff to relentless humiliation, intimidation, and ridicule, because of his race, creating an abusive and/or hostile work environment.

168.   Plaintiff is a black, African American, U.S. Citizen, and therefore is a protected class member.

169.   Plaintiff suffered unwelcome harassment because of his race, color, and national origin, that was both subjectively and objectively hostile.

170.   The abusive nature of Plaintiff's work environment cannot be overstated.  The Company and its agents referred to Plaintiff as a "nigger," every day of his employment.

171.   Plaintiff's coworkers would approach him and say things like, "Good morning, nigger," or, "Fuck you, nigger," or "You're a stupid, dumb nigger."

172.   On other occasions, the Company's employees would approach Plaintiff and say, "We don't want you here," or "You don't belong."

173.    Similarly, employees would approach Plaintiff and call him a "lazy American," and "this place is for Cubans only."

174.    During the 2020 election season, Malone's co-workers would stop him and say, "Trump, nigger!" or "I'm just like Trump—I don't like blacks!"  On another occasion, in or around early January of 2021, Plaintiff was leaving work when a Hispanic employee drinking a beer in his truck said, "What do you think of Trump, nigger?"

175.    Further, the Company's employees targeted Plaintiff with racist, hateful imagery. For example, Plaintiff discovered drawings of black stickmen lynched on boxes.  On or about Thanksgiving Day of 2020, Plaintiff discovered a hate message in the bathroom that read: "Fuck you pussy ass niggas."

176.    In or around late January of 2021, a Company executive suspended Plaintiff.   The executive said, "Send that black guy home for three days—no pay!"

177.    Plaintiff perceived the above-described conduct as hostile.

178.    Likewise, any reasonable person would perceive such conduct as hostile.

179.    Indeed, the above-described conduct was frequent and severe and extremely humiliating and was made because of Plaintiff's race, color, and national origin.

180.    Further, this environment was humiliating, and caused Plaintiff extreme emotional distress.  Indeed, in or around December of 2020, Plaintiff contemplated killing himself.

181.    The Company is liable for the above-described conduct because Plaintiff complained about racism upwards of ten times per week to multiple supervisors and department managers.  Moreover, Plaintiff complained directly to the Company president.  Thus, the Company had notice of such conduct.

182.    Still, the Company made clear it had no interest in rectifying these discrete, racist acts.  Indeed, Plaintiff complained to his immediate supervisor, Mr. Luis.  Plaintiff would say, "Man, they're calling me 'nigger' every day, and that's not cool."

183.    On another occasion, Plaintiff told Mr. Luis about the racist pictures throughout the workplace.  Plaintiff showed the photos to Mr. Luis and said, "I find these hangmen with blacks on nooses being lynched."  Still, Mr. Luis nor the Company took zero corrective action.

184.    Plaintiff complained to other supervisors, including the warehouse manager, the doors manager, and the Company President.  One of the supervisors said, "I'll handle it," yet nothing ever got handled.  The warehouse manager told Plaintiff he did not understand English. But then, when Plaintiff brought an interpreter to complain to the warehouse manager, he still claimed he did not understand what Plaintiff was saying (that he was being called a "nigger" repeatedly).

185.    Consequently, as a result of the Company's inaction, the abusive and/or hostile work environment intensified.

186.    On Thanksgiving Day of 2020, Plaintiff walked into the bathroom and discovered "Fuck you pussy niggas," written on the bathroom mirror.  Plaintiff complained to Senaris who said, "I don't believe you."  Then Senaris realized Plaintiff was truthful when Senaris himself saw the hate message, took a photo, shut the bathroom down, had it painted over, and failed to initiate an investigation of any kind.

187.    The Company's failure to investigate and/or correct the racial discrimination in its workplace necessarily altered the terms and conditions of Plaintiff's employment to the extent the Company maintained a policy that prohibited discrimination.

188.     The Company further altered the terms and conditions of Plaintiff's employment because of his race, color, and national origin, by paying Plaintiff less than Hispanic and/or Cuban employees because of Plaintiff's race, color, and national origin.

189.     The Company altered the terms and conditions of Plaintiff's employment because of his race, color, and national origin, by disciplining Plaintiff more severely than Hispanic and/or Cuban employees,

190.     The Company is liable for the environment because the Company had actual notice of Plaintiff's discrimination complaints, yet took zero corrective action.

191.     The Company's supervisors, managers, officers, and even its President *did not care* that its employees had relentlessly discriminated against Plaintiff, day in and day out, and its supervisors not only took zero corrective action, but actually facilitated the abuse.

192.     The Company violated § 1981 by subjecting Plaintiff to an abusive hostile work environment because of his race, color, and national origin.

193.     As an actual and proximate result of The Company's unlawful employment practices in violation of Title VII, Plaintiff has suffered damages.

194.     The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

## COUNT VI
## FCRA § 760.10(1)(a)
## Hostile Work Environment
## (Against Mr. Glass Doors & Windows)

195.     Plaintiff reincorporates the allegations in paragraphs 32-49.

196.    Mr. Glass Doors & Windows violated the FCRA by subjecting Plaintiff to relentless humiliation, intimidation, and ridicule, because of his race, creating an abusive and/or hostile work environment.

197.    Plaintiff is a black, African American, U.S. Citizen, and therefore is a protected class member.

198.    Plaintiff suffered unwelcome harassment because of his race, color, and national origin, that was both subjectively and objectively hostile.

199.    The abusive nature of Plaintiff's work environment cannot be overstated.  The Company and its agents referred to Plaintiff as a "nigger," every day of his employment.

200.    Plaintiff's coworkers would approach him and say things like, "Good morning, nigger," or, "Fuck you, nigger," or "You're a stupid, dumb nigger."

201.    On other occasions, the Company's employees would approach Plaintiff and say, "We don't want you here," or "You don't belong."

202.    Similarly, employees would approach Plaintiff and call him a "lazy American," and "this place is for Cubans only."

203.    During the 2020 election season, Malone's co-workers would stop him and say, "Trump, nigger!" or "I'm just like Trump—I don't like blacks!"  On another occasion, in or around early January of 2021, Plaintiff was leaving work when a Hispanic employee drinking a beer in his truck said, "What do you think of Trump, nigger?"

204.    Further, the Company's employees targeted Plaintiff with racist, hateful imagery. For example, Plaintiff discovered drawings of black stickmen lynched on boxes.  On or about Thanksgiving Day of 2020, Plaintiff discovered a hate message in the bathroom that read: "Fuck you pussy ass niggas."

205.    In or around late January of 2021, a Company executive suspended Plaintiff.   The executive said, "Send that black guy home for three days—no pay!"

206.    Plaintiff perceived the above-described conduct as hostile.

207.    Likewise, any reasonable person would perceive such conduct as hostile.

208.    Indeed, the above-described conduct was frequent and severe and extremely humiliating and was made because of Plaintiff's race, color, and national origin.

209.    Further, this environment was humiliating, and caused Plaintiff extreme emotional distress.  Indeed, in or around December of 2020, Plaintiff contemplated killing himself.

210.    The Company is liable for the above-described conduct because Plaintiff complained about racism upwards of ten times per week to multiple supervisors and department managers.  Moreover, Plaintiff complained directly to the Company president.  Thus, the Company had notice of such conduct.

211.    Still, the Company made clear it had no interest in rectifying these discrete, racist acts.  Indeed, Plaintiff complained to his immediate supervisor, Mr. Luis.  Plaintiff would say, "Man, they're calling me 'nigger' every day, and that's not cool."

212.    On another occasion, Plaintiff told Mr. Luis about the racist pictures throughout the workplace.  Plaintiff showed the photos to Mr. Luis and said, "I find these hangmen with blacks on nooses being lynched."  Still, Mr. Luis nor the Company took zero corrective action.

213.    Plaintiff complained to other supervisors, including the warehouse manager, the doors manager, and the Company President.  One of the supervisors said, "I'll handle it," yet nothing ever got handled.  The warehouse manager told Plaintiff he did not understand English. But then, when Plaintiff brought an interpreter to complain to the warehouse manager, he still

claimed he did not understand what Plaintiff was saying (that he was being called a "nigger" repeatedly).

214. Consequently, as a result of the Company's inaction, the abusive and/or hostile work environment intensified.

215. On Thanksgiving Day of 2020, Plaintiff walked into the bathroom and discovered "Fuck you pussy niggas," written on the bathroom mirror.  Plaintiff complained to Senaris who said, "I don't believe you."  Then Senaris realized Plaintiff was truthful when Senaris himself saw the hate message, took a photo, shut the bathroom down, had it painted over, and failed to initiate an investigation of any kind.

216. The Company's failure to investigate and/or correct the racial discrimination in its upon actual notice of such conduct necessarily altered the terms and conditions of Plaintiff's employment to the extent the Company maintained a policy that prohibited discrimination.

217. The Company further altered the terms and conditions of Plaintiff's employment because of his race, color, and national origin, by paying Plaintiff less than Hispanic and/or Cuban employees because of Plaintiff's race, color, and national origin.

218. The Company altered the terms and conditions of Plaintiff's employment because of his race, color, and national origin, by disciplining Plaintiff more severely than Hispanic and/or Cuban employees,

219. The Company is liable for the environment because the Company had actual notice of Plaintiff's discrimination complaints, yet took zero corrective action.

220. The Company's supervisors, managers, officers, and even its President *did not care* that its employees had relentlessly discriminated against Plaintiff, day in and day out, and its supervisors not only took zero corrective action, but actually facilitated the abuse.

221.    The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

222.    The Company violated FCRA § 760.10(1)(a) by discriminating against Plaintiff in the terms, conditions, and privileges of Plaintiff's employment because of his race, color, and national origin.

223.    As an actual and proximate result of The Company's unlawful employment practices in violation of the FCRA, Plaintiff has suffered damages.

### COUNT VII
**Title VII, 42 U.S.C. § 2000e-3(a)**
**Retaliation**
**(Against Mr. Glass Doors & Windows)**

224.    Plaintiff reincorporates the allegations in paragraphs 43-49.

225.    The Company violated Title VII's anti-retaliation provision by taking materially adverse actions against Plaintiff because he engaged in protected activity.

226.    Plaintiff engaged in protect activity by complaining about the Company's discriminatory employment practices, which he reasonably believed were motivated by discriminatory animus because of Plaintiff's race, color, and national origin.

227.    Plaintiff engaged in protected activity in or around late October of 2020, when he complained to Mr. Luis that his coworkers were calling him a "nigger" every day.  Plaintiff would say, "Man, they're calling me 'nigger' every day, and that's not cool."  Plaintiff further engaged in protected activity when he showed Mr. Luis the lynching images he found.  Plaintiff said, "I find these hangmen with blacks on nooses being lynched."  Plaintiff further engaged in protected activity when he complained to Mr. Luis that he was hired as a forklift operator but was never allowed to operate the forklifts. Likewise, Plaintiff engaged in protected activity when he

complained to Mr. Luis that he was still being paid $13 an hour after the 90-day period, while the Company was paying similarly situated employees $15 an hour after the 90-day period.

228.    Plaintiff suffered materially adverse actions because of his protected activity described above.  Mr. Luis took no corrective action after Plaintiff complained that his coworkers insisted on referring to him as a "nigger."   Indeed, Mr. Luis never reported Plaintiff's discrimination complaints—with respect to Plaintiff being called a "nigger," the racist images, or the pay disparity—to any Company supervisors, executives, or H.R.  Mr. Luis did not allow Plaintiff to operate the forklifts, but continued assigning non-certified, Hispanic employees to operate the forklifts.  Mr. Luis never addressed Plaintiff's pay disparity even though he understood the Company was paying similarly situated Hispanic and/or Cuban employees $15 an hour after the 90-day period.

229.    Any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisor would not take any corrective action after the worker repeatedly complained that he was being called a "nigger"; if the employer continued not allowing the worker to operate forklifts and continued assigning non-certified, Hispanic employees to operate the forklifts; and if the supervisor never reported to the Company that the employee's pay was less than similarly situated employees.

230.    The above-described materially adverse actions are causally connected to his protected activity because Plaintiff's discrimination complaints to Mr. Luis and the subsequent adverse actions are not wholly unrelated.  Indeed, Mr. Luis had actual knowledge of Plaintiff's protected activity because Plaintiff complained to Mr. Luis directly.  Further, Mr. Luis took the adverse actions against Plaintiff because of Plaintiff's protected activity.

231.   Plaintiff further engaged in protected activity in or around early November of 2020, when he complained to the warehouse manager that his coworkers were calling him a "nigger."

232.   Likewise, Plaintiff suffered materially adverse actions because of his protected activity to the warehouse manager as described above.  The warehouse manager told Plaintiff he did not understand English when Plaintiff complained about the Company's discriminatory practices.  Then, after Plaintiff complained to the warehouse manager via an interpreter, the warehouse manager still claimed he did not understand English and did nothing to correct discrimination.  Further, the manager said he would "handle it," yet nothing was ever "handled."

233.   Any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisor would pretend he did not understand English when the worker complained that he was being called a "nigger"; and that the supervisor would continue to ignore the complaints after the worker complained to the supervisor via an interpreter, or otherwise do nothing to correct the discrimination when he told the employee he would "handle it."

234.   Plaintiff's materially adverse actions described above are causally connected to his protected activity because Plaintiff's discrimination complaints to the warehouse manager and the subsequent adverse actions are not wholly unrelated.  Indeed, the warehouse manager had actual knowledge of Plaintiff's discrimination complaints because Plaintiff complained to the warehouse manager directly.  Further, the warehouse manager took the above adverse actions because of Plaintiff's protected activity.  To be sure, the warehouse manager would not have taken the above adverse actions but-for Plaintiff's discrimination complaints to him.

235.   Plaintiff further engaged in protected activity on or about Thanksgiving Day of 2020, when he complained to Senaris about the racist speech in the bathroom.

236.   Plaintiff suffered materially adverse actions because of his protected activity to Senaris as described above.  Indeed, on Thanksgiving Day of 2020, after Plaintiff told Senaris about the racist hate speech in the bathroom, Senaris told Plaintiff "I don't believe you."   Then, after Plaintiff showed Senaris the racist hate speech, Senaris took a picture, had the speech painted over, and took no further corrective action.

237.   The above-described actions are materially adverse because any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisors would not correct a hostile work environment which they had notice of; if the President of the Company told the employee he did not believe him, then take a picture, have the hate speech painted over— to make it like it never existed—and took no further corrective action.

238.   Plaintiff's materially adverse actions described above are causally connected to his protected activity because his discrimination complaints to Senaris and the subsequent adverse actions are not wholly unrelated.   Indeed, Senaris had actual knowledge of Plaintiff's discrimination complaints because Plaintiff complained to Senaris directly.   Moreover, Plaintiff's protected activity and subsequent adverse actions are causally connected based on temporal proximity.   Senaris said, "I don't believe you," in response to Plaintiff's complaints about the hate speech in the bathroom.   Seconds later, Senaris saw the hate imagery, took a photograph, and had the hate speech painted over.

239.   As a result of the Company's employment practices in violation of Title VII's anti-retaliation provision, Plaintiff has suffered damages.

240.   The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

**COUNT VIII**
**42 U.S.C. § 1981**
**Retaliation**
**(Against all Defendants)**

241.    Plaintiff reincorporates the allegations in paragraphs 43-49.

242.    The Company violated § 1981 by taking materially adverse actions against Plaintiff because he engaged in protected activity.

243.    Plaintiff engaged in protect activity by complaining about the Company's discriminatory employment practices, which he reasonably believed were motivated by discriminatory animus because of Plaintiff's race, color, and national origin.

244.    Plaintiff engaged in protected activity in or around late October of 2020, when he complained to Mr. Luis that his coworkers were calling him a "nigger" every day. Plaintiff would say, "Man, they're calling me 'nigger' every day, and that's not cool." Plaintiff further engaged in protected activity when he showed Mr. Luis the lynching images he found. Plaintiff said, "I find these hangmen with blacks on nooses being lynched." Plaintiff further engaged in protected activity when he complained to Mr. Luis that he was hired as a forklift operator but was never allowed to operate the forklifts. Likewise, Plaintiff engaged in protected activity when he complained to Mr. Luis that he was still being paid $13 an hour after the 90-day period, while the Company was paying similarly situated employees $15 an hour after the 90-day period.

245.    Plaintiff suffered materially adverse actions because of his protected activity described above. Mr. Luis took no corrective action after Plaintiff complained that his coworkers insisted on referring to him as a "nigger." Indeed, Mr. Luis never reported Plaintiff's discrimination complaints—with respect to Plaintiff being called a "nigger," the racist images, or the pay disparity—to any Company supervisors, executives, or H.R. Mr. Luis did not allow Plaintiff to operate the forklifts, but continued assigning non-certified, Hispanic employees to

operate the forklifts. Mr. Luis never addressed Plaintiff's pay disparity even though he understood the Company was paying similarly situated Hispanic and/or Cuban employees $15 an hour after the 90-day period.

246. Any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisor would not take any corrective action after the worker repeatedly complained that he was being called a "nigger"; if the employer continued not allowing the worker to operate forklifts and continued assigning non-certified, Hispanic employees to operate the forklifts; and if the supervisor never reported to the Company that the employee's pay was less than similarly situated employees.

247. The above-described materially adverse actions are causally connected to his protected activity because Plaintiff's discrimination complaints to Mr. Luis and the subsequent adverse actions are not wholly unrelated. Indeed, Mr. Luis had actual knowledge of Plaintiff's protected activity because Plaintiff complained to Mr. Luis directly. Further, Mr. Luis took the adverse actions against Plaintiff because of Plaintiff's protected activity.

248. Plaintiff further engaged in protected activity in or around early November of 2020, when he complained to the warehouse manager that his coworkers were calling him a "nigger."

249. Likewise, Plaintiff suffered materially adverse actions because of his protected activity to the warehouse manager as described above. The warehouse manager told Plaintiff he did not understand English when Plaintiff complained about the Company's discriminatory animus. Then, after Plaintiff complained to the warehouse manager via an interpreter, the warehouse manager still did nothing to correct discrimination. Further, the manager said he would "handle it," yet nothing was ever "handled" or investigated.

250.    Any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisor would pretend he did not understand English when the worker complained that he was being called a "nigger"; and that the supervisor would continue to ignore the complaints after the worker complained to the supervisor via an interpreter, or otherwise do nothing to correct the discrimination when he told the employee he would "handle it."

251.    Plaintiff's materially adverse actions described above are causally connected to his protected activity because Plaintiff's discrimination complaints to the warehouse manager and the subsequent adverse actions are not wholly unrelated.  Indeed, the warehouse manager had actual knowledge of Plaintiff's discrimination complaints because Plaintiff complained to the warehouse manager directly.  Further, the warehouse manager took the above adverse actions because of Plaintiff's protected activity.  To be sure, the warehouse manager would not have taken the above adverse actions but-for Plaintiff's discrimination complaints to him.

252.    Plaintiff further engaged in protected activity on or about Thanksgiving Day of 2020, when he complained to Senaris about the racist speech in the bathroom.

253.    Plaintiff suffered materially adverse actions because of his protected activity to Senaris as described above.  Indeed, on Thanksgiving Day of 2020, after Plaintiff told Senaris about the racist hate speech in the bathroom, Senaris told Plaintiff "I don't believe you."   Then, after Plaintiff showed Senaris the racist hate speech, Senaris took a picture, had the speech painted over, and took no further corrective action.

254.    The above-described actions are materially adverse because any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisors would not correct a hostile work environment which they had notice of; if the President of the Company

told the employee he did not believe him,  then take a picture, have the hate speech painted over—to make it like it never existed—and took no further corrective action.

255.    Plaintiff's materially adverse actions described above are causally connected to his protected activity because his discrimination complaints to Senaris and the subsequent adverse actions are not wholly unrelated.   Indeed, Senaris had actual knowledge of Plaintiff's discrimination complaints because Plaintiff complained to Senaris directly.  Moreover, Plaintiff's protected activity and subsequent adverse actions are causally connected based on temporal proximity.  Senaris said, "I don't believe you," in response to Plaintiff's complaints about the hate speech in the bathroom.  Seconds later, Senaris saw the hate imagery, took a photograph, and had the hate speech painted over.

256.    As a result of the Company's employment practices in violation of § 1981, Plaintiff has suffered damages.

257.    The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

**COUNT IX**
**FCRA § 760.10(7)**
**Retaliation**
**(Against Mr. Glass Doors & Windows)**

258.    Plaintiff reincorporates the allegations in paragraphs 43-49.

259.    The Company violated the FCRA's anti-retaliation provision by taking materially adverse actions against Plaintiff because he engaged in protected activity.

260.    Plaintiff engaged in protected activity by complaining about the Company's discriminatory employment practices, which he reasonably believed were motivated by discriminatory animus because of Plaintiff's race, color, and national origin.

261.   Plaintiff engaged in protected activity in or around late October of 2020, when he complained to Mr. Luis that his coworkers were calling him a "nigger" every day.  Plaintiff would say, "Man, they're calling me 'nigger' every day, and that's not cool."  Plaintiff further engaged in protected activity when he showed Mr. Luis the lynching images he found.  Plaintiff said, "I find these hangmen with blacks on nooses being lynched."  Plaintiff further engaged in protected activity when he complained to Mr. Luis that he was hired as a forklift operator but was never allowed to operate the forklifts. Likewise, Plaintiff engaged in protected activity when he complained to Mr. Luis that he was still being paid $13 an hour after the 90-day period, while the Company was paying similarly situated employees $15 an hour after the 90-day period.

262.   Plaintiff suffered materially adverse actions because of his protected activity described above.  Mr. Luis took no corrective action after Plaintiff complained that his coworkers insisted on referring to him as a "nigger."   Indeed, Mr. Luis never reported Plaintiff's discrimination complaints—with respect to Plaintiff being called a "nigger," the racist images, or the pay disparity—to any Company supervisors, executives, or H.R.  Mr. Luis did not allow Plaintiff to operate the forklifts, but continued assigning non-certified, Hispanic employees to operate the forklifts.  Mr. Luis never addressed Plaintiff's pay disparity even though he understood the Company was paying similarly situated Hispanic and/or Cuban employees $15 an hour after the 90-day period.

263.   Any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisor would not take any corrective action after the worker repeatedly complained that he was being called a "nigger"; if the employer continued not allowing the worker to operate forklifts and continued assigning non-certified, Hispanic employees to operate the

forklifts; and if the supervisor never reported to the Company that the employee's pay was less than similarly situated employees.

264. The above-described materially adverse actions are causally connected to his protected activity because Plaintiff's discrimination complaints to Mr. Luis and the subsequent adverse actions are not wholly unrelated. Indeed, Mr. Luis had actual knowledge of Plaintiff's protected activity because Plaintiff complained to Mr. Luis directly. Further, Mr. Luis took the adverse actions against Plaintiff because of Plaintiff's protected activity.

265. Plaintiff further engaged in protected activity in or around early November of 2020, when he complained to the warehouse manager that his coworkers were calling him a "nigger."

266. Likewise, Plaintiff suffered materially adverse actions because of his protected activity to the warehouse manager as described above. The warehouse manager told Plaintiff he did not understand English when Plaintiff complained about the Company's discriminatory animus. Then, after Plaintiff complained to the warehouse manager via an interpreter, the warehouse manager still did nothing to correct discrimination. Further, the manager said he would "handle it," yet nothing was ever "handled" or investigated.

267. Any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisor would pretend he did not understand English when the worker complained that he was being called a "nigger"; and that the supervisor would continue to ignore the complaints after the worker complained to the supervisor via an interpreter, or otherwise do nothing to correct the discrimination when he told the employee he would "handle it."

268. Plaintiff's materially adverse actions described above are causally connected to his protected activity because Plaintiff's discrimination complaints to the warehouse manager and the subsequent adverse actions are not wholly unrelated. Indeed, the warehouse manager had actual

knowledge of Plaintiff's discrimination complaints because Plaintiff complained to the warehouse manager directly.  Further, the warehouse manager took the above adverse actions because of Plaintiff's protected activity.  To be sure, the warehouse manager would not have taken the above adverse actions but-for Plaintiff's discrimination complaints to him.

269.    Plaintiff further engaged in protected activity on or about Thanksgiving Day of 2020, when he complained to Senaris about the racist speech in the bathroom.

270.    Plaintiff suffered materially adverse actions because of his protected activity to Senaris as described above.  Indeed, on Thanksgiving Day of 2020, after Plaintiff told Senaris about the racist hate speech in the bathroom, Senaris told Plaintiff "I don't believe you."   Then, after Plaintiff showed Senaris the racist hate speech, Senaris took a picture, had the speech painted over, and took no further corrective action.

271.    The above-described actions are materially adverse because any reasonable worker well might be dissuaded about opposing discrimination if the worker knew his supervisors would not correct a hostile work environment which they had notice of; if the President of the Company told the employee he did not believe him,  then take a picture, have the hate speech painted over— to make it like it never existed—and took no further corrective action.

272.    Plaintiff's materially adverse actions described above are causally connected to his protected activity because his discrimination complaints to Senaris and the subsequent adverse actions are not wholly unrelated.   Indeed, Senaris had actual knowledge of Plaintiff's discrimination complaints because Plaintiff complained to Senaris directly.  Moreover, Plaintiff's protected activity and subsequent adverse actions are causally connected based on temporal proximity.  Senaris said, "I don't believe you," in response to Plaintiff's complaints about the hate

speech in the bathroom.  Seconds later, Senaris saw the hate imagery, took a photograph, and had the hate speech painted over.

273.    Hence, for the foregoing reasons, the Company discriminated against Plaintiff in violation of the FCRA § 760.10(7).

274.    The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

275.    As a result of the Company's unlawful retaliation, Plaintiff has suffered damages.

**COUNT X**
**Title VII, 42 U.S.C. § 2000e-3(a)**
**Retaliatory Hostile Work Environment**
**(Against Mr. Glass Doors &Windows)**

276.    Plaintiff reincorporates the allegations contained in paragraphs 32-49.

277.    The Company violated Title VII by subjecting Plaintiff to a retaliatory hostile work environment because he complained about race discrimination.

278.    Plaintiff engaged in protected activity by complaining about discrimination to at least five different supervisors, multiple times per week during the Fall of 2020.  On a weekly and repeated basis, Plaintiff complained to Mr. Luis.  He complained to Senaris. He complained to the "warehouse manager." He complained to the "glass manager."  He complained to the "doors manager."  He complained to H.R.

279.    Plaintiff complained of harassing statements and conduct that were racial in nature. Specifically, Plaintiff told the above supervisors that he was being called a "nigger" every day. Plaintiff told Mr. Luis, "Man, they're calling me 'nigger' every day, and that's not cool."

280.    He complained about the racist drawings, and markings in the warehouse isles and bathroom.

281.    After complaining, the Company continued subjecting Plaintiff to repeated unwelcome harassment because he complained about racial discrimination.

282.    For example, on Thanksgiving Day of 2020, after Plaintiff told Senaris about the racist hate speech in the bathroom, Senaris said, "I don't believe you."  Then, when Plaintiff showed Senaris the imagery in the bathroom, Senaris took a picture on his cellphone, closed the bathroom door, and had someone paint over the hate speech.  The Company never investigated the conduct.

283.    The Company and its agents subjected Plaintiff to frequent, severe and humiliating race discrimination.  For instance, after Plaintiff complained about discrimination, the Company's agents continued referring to Plaintiff as a "nigger" every day.  Throughout the Fall of 2020, Hispanic coworkers would call Plaintiff a "stupid dumb nigger," or say, "I'm just like Trump—I hate the blacks."

284.    Any reasonable worker in Plaintiff's position well might be dissuaded from complaining about race discrimination if he knew that the supervisors—including the President of the Company—would take no action to correct race discrimination and that he would be repeatedly referred to as a "nigger," on a daily basis.

285.    The above-described severe and pervasive accumulation of actions would not have occurred but-for the retaliatory reason of Plaintiff's discrimination complaints.

286.    Hence, for the foregoing reasons, the Company discriminated against Plaintiff in violation of Title VII.

287.    As a result of the Company's unlawful retaliation in violation of Title VII, Plaintiff has suffered damages.

288.   The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

**COUNT XI**
**FCRA 760.10(a)**
**Retaliatory Hostile Work Environment**
**(Against Mr. Glass Doors and Windows)**

289.   Plaintiff reincorporates the allegations in paragraphs 32-49.

290.   The Company violated the FCRA by subjecting Plaintiff to a retaliatory hostile work environment because he complained about race discrimination.

291.   Plaintiff engaged in protected activity by complaining about discrimination to at least five different supervisors, multiple times per week during the Fall of 2020.  On a weekly and repeated basis, Plaintiff complained to Mr. Luis.  He complained to Senaris. He complained to the "warehouse manager." He complained to the "glass manager."  He complained to the "doors manager."  He complained to H.R.

292.   Plaintiff complained of harassing statements and conduct that were racial in nature. Specifically, Plaintiff told the above supervisors that he was being called a "nigger" every day. Plaintiff told Mr. Luis, "Man, they're calling me 'nigger' every day, and that's not cool."

293.   He complained about the racist drawings, and markings in the warehouse isles and bathroom.

294.   After complaining, the Company continued subjecting Plaintiff to repeated unwelcome harassment because he complained about racial discrimination.

295.   For example, on Thanksgiving Day of 2020, after Plaintiff told Senaris about the racist hate speech in the bathroom, Senaris said, "I don't believe you."  Then, when Plaintiff showed Senaris the imagery in the bathroom, Senaris took a picture on his cellphone, closed the

bathroom door, and had someone paint over the hate speech.  The Company never investigated the conduct.

296.    The Company and its agents subjected Plaintiff to frequent, severe and humiliating race discrimination.  For instance, after Plaintiff complained about discrimination, the Company's agents continued referring to Plaintiff as a "nigger" every day.  Throughout the Fall of 2020, Hispanic coworkers would call Plaintiff a "stupid dumb nigger," or say, "I'm just like Trump—I hate the blacks."

297.    Any reasonable worker in Plaintiff's position well might be dissuaded from complaining about race discrimination if he knew that the supervisors—including the President of the Company—would take no action to correct race discrimination and that he would be repeatedly referred to as a "nigger," on a daily basis.

298.    The above-described severe and pervasive accumulation of actions would not have occurred but-for the retaliatory reason of Plaintiff's discrimination complaints.

299.    Hence, for the foregoing reasons, the Company discriminated against Plaintiff in violation of the FCRA.

300.    As a result of the Company's unlawful retaliation in violation of the FCRA, Plaintiff has suffered damages.

301.    The Company's conduct described throughout this complaint was malicious, willful, and/or with deliberate indifference to Plaintiff's civil rights, to warrant punitive damages against the Company.

**COUNT XI**
**ADA, 42 U.S.C. § 12112**
**Retaliatory Hostile Work Environment - Disability**
**(Against Mr. Glass Doors & Windows)**

302.    Plaintiff reincorporates the allegations contained in paragraphs 60-73.

303. The Company violated the ADA by subjecting Plaintiff to a retaliatory hostile work environment because he requested weightlifting restriction accommodations.

304. Plaintiff engaged in protected activity when he requested a reasonable accommodation following his industrial accident and injury, and subsequent diagnosis of a sprained lumbar spine. Plaintiff further engaged in protected activity when he told Fors that Dr. Nelson had placed a weight-lifting restriction as a result of his lumbar spine strain.

305. Plaintiff suffered materially adverse actions because of the above-described protected activity. Indeed, notwithstanding the doctor's restrictions, however, the Company required Plaintiff to report to work every day to physically provide every document after Plaintiff attended each medical appointment. Worse, the Company ignored the weight restrictions and insisted on requiring Plaintiff to conduct his regular activities—lifting, pushing, and pulling more than 7-10 pounds. When Plaintiff attempted to explain that Fors had instructed his physical limitations, Fors threatened Plaintiff, saying, "Either do what you're told or you won't have a job."

306. Consequently—after Plaintiff had no choice but to report to work and continuing lifting more than 7-10 pounds—Dr. Nelson placed Plaintiff on more extensive weight restrictions. On or about March 2, 2021, Dr. Nelson increased Plaintiff's physical limitations to no lifting, pushing or pulling of more than 10 pounds, as a result of the Company's instance that Plaintiff work notwithstanding Dr. Nelson's lifting limitations.

307. Any reasonable worker might well have been dissuaded from requesting a disability accommodation if he knew his employer would ignore the accommodation, threaten his employment, and deliberately require the employee to engage in physical activity which a physician—*the one the employer selected*—increased the physical limitations because the employer required the employee to work through the limitations, or else he would be terminated.

308.    The above-described adverse actions are causally connected to his reasonable accommodation request.  The Company, via Fors, was aware of Plaintiff's requests and subjected him to the above-described adverse actions because of his request.  Indeed, Fors was aware that Plaintiff's physical limitations as result of his lumbar spine sprain.

## COUNT XII
### FCRA, § 760.10(a)
### Retaliatory Hostile Work Environment - Disability
### (Against Mr. Glass Doors & Windows)

309.    Plaintiff reincorporates the allegations in paragraphs 60-73.

310.    The Company violated the FCRA by subjecting Plaintiff to a retaliatory hostile work environment because he requested weightlifting restriction accommodations.

311.    Plaintiff engaged in protected activity when he requested a reasonable accommodation following his industrial accident and injury, and subsequent diagnosis of a sprained lumbar spine.  Plaintiff further engaged in protected activity when he told Fors that Dr. Nelson had placed a weight-lifting restriction as a result of his lumbar spine strain.

312.    Plaintiff suffered materially adverse actions because of the above-described protected activity.  Indeed, notwithstanding the doctor's restrictions, however, the Company required Plaintiff to report to work every day to physically provide every document after Plaintiff attended each medical appointment.  Worse, the Company ignored the weight restrictions and insisted on requiring Plaintiff to conduct his regular activities—lifting, pushing, and pulling more than 7-10 pounds.  When Plaintiff attempted to explain that Fors had instructed his physical limitations, Fors threatened Plaintiff, saying, "Either do what you're told or you won't have a job."

313.    Consequently—after Plaintiff had no choice but to report to work and continuing lifting more than 7-10 pounds—Dr. Nelson placed Plaintiff on more extensive weight restrictions. On or about March 2, 2021, Dr. Nelson increased Plaintiff's physical limitations to no lifting,

pushing or pulling of more than 10 pounds, as a result of the Company's instance that Plaintiff work notwithstanding Dr. Nelson's lifting limitations.

314.    Any reasonable worker might well have been dissuaded from requesting a disability accommodation if he knew his employer would ignore the accommodation, threaten his employment, and deliberately require the employee to engage in physical activity which a physician—*the one the employer selected*—increased the physical limitations because the employer required the employee to work through the limitations, or else he would be terminated.

315.    The above-described adverse actions are causally connected to his reasonable accommodation request.  The Company, via Fors, was aware of Plaintiff's requests and subjected him to the above-described adverse actions because of his request.  Indeed, Fors was aware that Plaintiff's physical limitations as result of his lumbar spine sprain.

### COUNT XIII
### Fla Stat. § 440.205
### Workers' Compensation Retaliation
### (Against Mr. Glass Doors & Windows)

316.    Plaintiff reincorporates the allegations contained in paragraphs 60-73.

317.    Florida statutes section   440.205 states, "No employer shall discharge, threaten to discharge, intimidate, or coerce any employee by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law."

318.    The Company violated Florida's workers' compensation law by engaging in each of the above proscribed actions.

319.    Plaintiff suffered an industrial accident on or about February 9, 2021.

320.    Plaintiff engaged in protected activity by attempting to file a workers' compensation claim on or about February 12, 2021.

321.    Plaintiff suffered materially adverse actions because the Company threatened to discharge Plaintiff, intimidated him, coerce him, and ultimately terminate his employment because he attempted to file and/or filed a workers' compensation claim.

322.    After Plaintiff engaged with H.R. to initiate his workers' compensation claim, the Company delayed appointing Plaintiff a treating physician.  Finally, on or about February 24, 2021, the Company selected Dr. Nelson to treat Plaintiff's injuries from his industrial accident.

323.    Following his injury, the Company forced Plaintiff to continue reporting to work notwithstanding restrictions placed on his weightlifting.   In or around late February of 2021, when Plaintiff complained to H.R. that the work was furthering his injury, Fors said, "Either do what you're told or you won't have a job."

324.    On or about March 19, 2021, the Company terminated Plaintiff's employment.

325.    The Company carried out the above prohibited acts because Plaintiff filed and/or attempted to file a workers' compensation claim.

326.    These circumstances give rise to the reasonable inference that the Company terminated Plaintiff's employment because he filed a valid workers' compensation claim.

327.    As a result of the above-described retaliation in violation of § 444.205, Plaintiff has suffered damages.

328.    The Company's conduct described with respect to Plaintiff's workers' compensation claim was willful, and/or with deliberate indifference to Plaintiff's rights, to warrant punitive damages against the Company.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against the Company, containing the following relief, respectively:

A.      As against Defendant Mr. Glass Doors & Windows, pursuant to FCRA § 760.11(5), Title VII § 102(b)(3), ADA 42 U.S.C. § 12112, and Florida Statutes § 440.205, and as against all Defendants, pursuant to 42 U.S.C. § 1981, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

B.      As against Defendant Mr. Glass Doors & Windows, pursuant to FCRA § 760.11(5), Title VII § 102(b)(3), ADA 42 U.S.C. § 12112, and Florida Statutes § 440.205, and as against all Defendants, pursuant to 42 U.S.C. § 1981, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

C.      As against Defendant Mr. Glass Doors & Windows, pursuant to FCRA § 760.11(5), Title VII § 102(b)(1), ADA, 42 U.SC. § 12112, Florida Statutes § 440.205, and as against all Defendants, pursuant to 42 U.S.C. § 1981, an award of punitive damages for damages arising from Defendants' discriminatory employment practices with malice or with reckless indifference to Plaintiff's rights under federal and state law;

D.      As against Defendant Mr. Glass Doors & Windows, pursuant to FCRA § 760.11(5) and Title VII § 103, ADA 42 U.S.C. § 12112, and as against all Defendants, pursuant to 42 U.S.C. § 1981, an award of costs that Plaintiff has incurred in this Action, as well as Plaintiff's reasonable attorneys' fees plus interest to the fullest extent permitted by law; and

E.      Such other and further relief the Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the

Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.

Dated: December 6, 2021

Respectfully submitted,

*/s/ Brett D. Kaplan* _____
Brett D. Kaplan, Esq.
Florida Bar No. 1031866
brett@dereksmithlaw.com
**DEREK SMITH LAW GROUP, PLLC**
701 Brickell Ave., Suite 1310
Miami, Florida 33131
Telephone: (305) 946-1884
Facsimile: (305) 503-6741
*Attorneys for Plaintiff Sean Malone*